GENERAL ELECTRIC CO. v. WINONA INTERURBAN RY. CO.

(Circuit Court of Appeals, Seventh Circuit.    April 11, 1911.)

### No. 1,741.

PATENTS (§ 328*)—INVENTION—REGULATION OF ELECTRIC CURRENTS.

The Steinmetz patent, No. 594,144, for an improvement in regulation of alternating current systems, is void for lack of patentable invention in view of the prior art.

Appeal from the Circuit Court of the United States for the District of Indiana.

Suit in equity by the General Electric Company against the Winona Interurban Railway Company.    Decree for defendant, and complainant appeals.    Affirmed.

The appeal is from a decree dismissing the bill for want of equity. The bill was to restrain infringement of letters patent No. 594,144, issued November 23, 1897, to Charles P. Steinmetz, assignor to appellant, for an Improvement in Regulation of Alternating-Current Systems.

The claims of the patent sued upon are as follows:

1. The combination in an alternating-current system, of a source of out-of-phase waves of current or electromotive force between the feeding-mains and a working subcircuit or branch of the system, and a phase-modifier in such subcircuit.

2. The combination in an alternating-current system, of a regulable phase-modifier in a subcircuit or branch of the system, and a localizer restricting the influence of the phase-modifier from other portions of the system, as set forth.

3. The combination in an alternating-current system, of a phase-modifier in a working subcircuit or branch of the system, and an inductance localizing the action of such phase-modifier, as set forth.

5. The combination in an alternating-current system, of a source of out-of-phase waves of current or electromotive force between the mains and a subcircuit of the system, with an electrodynamic phase-modifier comprising a conductor movable relatively to a magnetic field, and means for regulating the phase-modifier, as set forth.

6. The combination in an alternating-current system, of an inductance for localizing a subcircuit or portion of such system, and an electrodynamic phase-modifier comprising a conductor movable relatively to a magnetic field for modifying the relation of current and electromotive force in such regulated portion of the system and means for regulating the phase-modifier so as to cause the current to lead or lag, as set forth.

7. The combination is an alternating-current system, of an electrodynamic phase-modifier of the synchronous type regulable for modifying the phase relation as desired in a subcircuit or portion of the system, and an inductance serving as a localizer for restricting the influence of the phase-modifier, as set forth.

12. The combination in an alternating-current system, of an artificial inductance, a phase-modifier and means for regulating the phase-modifier so as to cause the current to lag or lead as desired.

18. The method of regulating an alternating-current-distribution system which consists in modifying the phase relation between current and electromotive force in a subcircuit or portion of such system requiring regulation, and localizing the influence of such phase modification from other portions of the system, as set forth.

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

22. The method of localizing a subcircuit supplied from alternating mains, which consists in adjusting the relative value of the self-induction and of displacement of phase of electromotive force and current in such portions to give the desired relation between the subcircuit and the mains.

The drawing in the patent is as follows:

In the application for the patent, the prior art is referred to as follows:

In other applications for Letters Patent I have shown that the phase relation between current and electromotive force in an alternating-current circuit may be modified by electro-dynamic phase-modifiers resembling in general construction the synchronous machines now used for motors and other purposes by properly regulating the field strength of the phase-modifier or otherwise. I have also shown that in this manner the evil effects of self-induction in an alternating circuit may be overcome or compensated and that constant potential or constant current may be maintained in the regulated circuit, together with other desired ends.

The present invention relates to the same subject of phase modification, and the phase-modifiers previously described are made a part of the invention in certain new combinations.

Other patents cited are the following:

No. 372,330, E. W. Rice, Jr., Nov. 1, 1887.
No. 383,662, O. B. Shallenberger, May 29. 1888.
No. 392,370, Sellon & Mordey, Nov. 6, 1888.
No. 508,638, E. W. Rice, Jr., Nov. 14, 1893.
No. 508,887, J. F. Kelly, Nov. 14, 1893.
No. 543,907, C. P. Steinmetz, Aug. 6, 1895.
No. 548,511, P. Boucherot, Oct. 22, 1895.
No. 582,131, B. G. Lamme, May 4, 1897.
No. 832,852, W. MacN. Fairfax, Oct. 9, 1906.

Further facts are stated in the opinion.

Parker W. Page and Thomas B. Kerr, for appellant.

C. V. Edwards, Thomas F. Sheridan, and Lawrence K. Sager, for appellee.

Before GROSSCUP and KOHLSAAT, Circuit Judges, and CARPENTER, District Judge.

GROSSCUP, Circuit Judge, after stating the facts as above, delivered the opinion:

The general nature and purpose of the Steinmetz invention, from the point of view of the appellant, is stated in the brief of the appellant as follows:

"The invention of the patent in suit is an improvement in systems for the distribution of alternating currents of electricity from a central power station over a main line or circuit running therefrom to a number of independent sub-circuits, the object being to so organize the system that each of the sub-circuits, whatever its individual requirements, will at all times in the operation of the system, experience the proper electric pressure or potential and receive the proper current for the operation of the translating devices connected with it, without reference to or disturbance of the conditions on either the main line or any of the other sub-circuits.

"In order to make this matter perfectly clear, assume that in the City of Indianapolis there is installed a large central generating station or power house at which is developed alternating current for the operation of electric lights, motors or other translating devices in a number of out-lying and isolated towns. A main line transmission circuit runs from the central station to such towns, and current is delivered to it at high tension or pressure. At each town a portion of this current is tapped or drawn off from the transmission line, lowered in pressure by means of static transformers, and fed into the local or sub-circuit mains extending through the town. It is evident that one of such sub-circuits may habitually carry a heavier load, that is to say, may supply more lamps or motors than the others, or that at given times one of such sub-circuits may be called upon to run more or less lamps or motors than another, and that, in general, the character and the amount of the load on each sub-circuit will be constantly varied.

"The greater the load on any given circuit, the greater the amount of current that must be delivered to that circuit to perform the work, but the conditions and amount of load on a circuit result in a variation of the pressure or potential that causes the current to flow therein, just as the pressure in the branch water pipes of a building is varied in each, according to the number of faucets opened or closed at different points in the building at the same time. Therefore, if with a given normal main line pressure or potential, the number of translating devices on a sub-circuit be increased or reduced, the potential on that sub-circuit varies accordingly, tending to produce a greater flow of current than required when the load is light, and a lesser proportionate flow when it is heavy.

"Manifestly, from the above considerations, if a heavy load be suddenly thrown on one of the sub-circuits of a system of distribution, such as that under present consideration, it would not be practicable to adjust the generator or generators at the central power station to raise the potential on the transmission line to meet the demands for higher pressure in that particular sub-circuit which such increased load imposes, for the adjoining or some other sub-circuit of the system may at that moment be carrying an abnormally light load and call for a lower potential. Thus, any variation of the main line potential might throw the whole system out of balance, and it would do so unless it should so possibly happen that the requirements of all the sub-circuits as to potential and current were at all times precisely the same. Again, it may happen that conditions arise in one or more of the sub-circuits that tend to *vary* the pressure or potential on that circuit, while the best conditions of operation require a constant pressure, or finally, the main line pressure may vary, while it is desirable to maintain a constant

pressure in the several sub-circuits or pressures varying in a manner different from that which the main line pressure undergoes.

"It 'is, therefore, essential to the proper operation of such a system that the regulation of each of the several sub-circuits should not only be *independent of that of the main line, but also of every other sub-circuit,* from which it follows that the introduction into one or more of the sub-circuits of such a distribution system, of a device, the *sole* function of which is that of regulation of potential, would not only fall far short of solving the problem with which the patent in suit deals, but might defeat the very purpose of the patent, for whatever effect such a device produced in a sub-circuit would be felt throughout the whole system. If, in other words, a device introduced into any one of the sub-circuits, should operate to raise or lower the potential in that portion of the system, it would raise or lower it all the way back to the generator, and thus affect all the other sub-circuits, for all being dependent parts of one system, they become in effect a unit, and what affects a part affects the whole.

"This explanation will suffice to illustrate the well established proposition in electrical engineering that in any system of distribution including a main supply circuit and two or more independent sub-circuits, the regulation of current and potential in each sub-circuit may be effected independently and in such manner as not appreciably to influence the conditions in respect to these factors in either the main circuit or in any of the other sub-circuits, or to put it otherwise, so that the main circuit potential may be maintained uniform or may be varied, but each sub-circuit will take care of itself and its potential varied, maintained uniform, or in general, regulated in any desired manner.

"It would be possible to accomplish this result by means well known in the art and which, at the date of the patent in suit, would have at once suggested themselves to an electrical engineer. For example, instead of simply drawing off current from the main line and delivering it directly or through static transformers to the sub-circuits, the current taken from the line at any given point, might be used to operate a motor, and this in turn used to drive an independent generator, feeding current into the sub-circuit, and this latter generator, by ordinary and well known means, might be regulated to give in the local or sub-circuit any current or potential that might be required. This plan, however, involves the use of *two* separate machines in addition to the static transformer for each sub-circuit, namely, a motor, and a generator, which obviously adds enormously to the complication and expense of the system.

"What Dr. Steinmetz undertook to do and accomplish by the invention' of the patent in suit, was to produce a practical means of distributing current from a transmission line *directly* over any number of sub-circuits, and, while securing in each of the sub-circuits any desired regulation of the potential or current therein according to need, to restrict or limit the effects of such regulation *to the sub-circuit where it occurs,* and thus to make the working conditions in each of the sub-circuits independent of those in the main or transmission line.

"He accomplished this by using in each sub-circuit two instrumentalities in combination or co-operative relation, one of which he designates in the patent in suit as a 'dynamic phase modifier' and the other as a 'localizer.' Neither of these devices was in itself new, but though known in the art prior to the date of the patent in suit, the two had never been associated as Steinmetz discovered they could be, nor used for any such purpose as he applied them. As a full appreciation of the invention as a whole requires a clear understanding of the nature of these devices, we devote space at this point to a somewhat detailed explanation thereof, and to definitions of terms used in the patent considering them."

Appellant's dynamic "phase modifier," just as it appears in the patent, is found in the prior act, performing the same function as in the patent. The "localizer" appears also in the prior art as a self induction coil, being used, as here, to produce synchronism between

the current and the electromotive force. And the relation of these two agencies to each other, reciprocally acting upon each other to produce synchronism, was known in the prior art.

With these facts in mind, counsel for appellant, at the oral argument, in reply to an inquiry from the Court, stated that were these two agencies to be used in a single circuit—that is to say, were the relation of sub-circuits to the main line to be eliminated—such use would not be covered by this patent. Indeed, there would be no occasion for such use in a single circuit, for the function of the dynamic phase modifier could be performed by the generator.

Counsel for appellant also stated, in answer to an inquiry from the Court, that were the self induction coil "I," in the Steinmetz patent (the "localizer"), to be omitted, the dynamic phase modifier would remain operative, with the effect, however, that its automatic action, in bringing about synchronism within the sub-circuits, might be reflected back into the main circuit, and thereby disturb conditions that ought not to be disturbed. The alleged new thing, therefore, that makes the Steinmetz combination patentable invention, if it be patentable invention at all, is the interposition of this self induction coil, for this purpose, into the sub-circuit. Is that, in view of the prior art, patentable invention?

We are of the opinion that it is not. The concept, as a mere concept, of bringing about synchronism in the sub-circuits, does not seem to us, in view of what electrical inventors and engineers were then thinking and doing, to have been invention. Not every advance is invention. Coming, as successive advances do, in the evolution of electrical uses, many such advances disclose nothing beyond good electrical engineering. To bring synchronism in the sub-circuits, when the sub-circuits had come, must have been within the thought of every electrical engineer; and to bring it about, independently of the main circuit, could not have escaped the thought of mere engineers. The concept present, Steinmetz had at hand, in the prior art, everything necessary to the concept except a means of cutting off the reflection back. And the self induction coil, as such means, appears to us, in view of the prior art, so obvious a means that its selection is not invention. That the use of the dynamic phase modifier might, unless something was interposed, reflect back upon the main line, must have been in the thought of electrical engineers; and to cut it off by the interposition of the well-known self induction coil, was almost as obvious as the interposition of resistance coils, where resistance coils are needed. To pronounce each adaptation of this kind patentable invention, would be to so encumber the electrical field with monopoly, that mere engineers would have no room to give to the art the benefit of their knowledge.

The decree appealed from is affirmed.